UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------- X
                                                           :
UNITED STATES OF AMERICA              :

       -against-                                 :        **OPINION AND ORDER**
                                                          :        1:20-cr-181 (PK)
KENT BULLOCH,                                :

       Defendant.                            :

------------------------------------------------------------- X

**Peggy Kuo, United States Magistrate Judge:**

Defendant Kent Bulloch is charged with conspiracy to violate the Defense Production Act of 1950 ("DPA"), 50 U.S.C. §§ 4512 and 4513, in violation of 18 U.S.C. §371. On July 15, 2022, Defendant filed a Motion to Dismiss the Information on the basis that 50 U.S.C. §§ 4512 is "void-for-vagueness." (Motion to Dismiss, Dkt. 55.)

For the foregoing reasons, Defendant's Motion to Dismiss is denied.

## BACKGROUND

**I.    The Defense Production Act of 1950 and COVID-19**

The DPA was enacted on September 8, 1950 in response to the Korean War and was preceded by the War Powers Acts of World War II. *See* Cong. Rsch. Serv., R43767, The Defense Production Act of 1950: History, Authorities, and Considerations of Congress, Summary (2020) [hereinafter "CRS Report"].

50 U.S.C. § 4512 permits the President to designate certain materials as scarce and to prescribe conditions "as he deems necessary to carry out the objectives of this chapter," namely, emergency preparedness and national security. 50 U.S.C. § 4512; *see* CRS Report at 4-5. Additionally, minutes from the DPA Hoarding and Strategic Materials Hearing held before the Joint Committee on Defense

1

Production on December 20, 1950 indicate that at the time the DPA was enacted, members of Congress were concerned about the availability of certain raw materials, including steel, that were necessary for the war effort. *See Defense Production Act Hoarding and Strategic Materials: Hearing Before the J. Comm. on Defense Production*, 81st Cong. 5 (1950) [hereinafter "DPA Hearing"].

While the DPA's primary concern was initially "shaping U.S. military preparedness and capabilities" in furtherance of national defense, over the years, "Congress has gradually expanded the scope of the definition of national defense." CRS Report at 5. National defense currently encompasses emergency preparedness activities, which include activities "designed or undertaken to prepare for or minimize the effects of a hazard upon the civilian population [or] to deal with the immediate emergency conditions which would be created by the hazard . . . ." *Id.* at 4.

Along those lines, after declaring a national emergency due to the threat posed by COVID-19 to the national security of the United States, *see* Proclamation No. 9994, 85 Fed. Reg. 15337 (Mar. 13, 2020), the President issued Executive Order 13909 on March 18, 2020. *See* Exec. Order No. 13909, 85 Fed. Reg. 16227 (Mar. 18, 2020). The Order stated in relevant part: "To ensure that our healthcare system is able to surge capacity and capability to respond to the spread of COVID-19, it is critical that all health and medical resources needed to respond to the spread of COVID-19 are properly distributed to the Nation's healthcare system and others that need them most at this time." *Id.* It, *inter alia*, found the "health and medical resources needed to respond to the spread of COVID-19, including personal protective equipment and ventilators" to be "scarce and critical materials essential to the national defense." *Id.*; *see* 50 U.S.C. § 4511(b). The President delegated authority to the Secretary of Health and Human Services (HHS) to "identify additional specific health and medical resources that meet the criteria of section 101(b) [of the DPA]." Exec. Order No. 13909, 85 Fed. Reg. 16227 (Mar. 18, 2020).

2

On March 23, 2020, the President issued Executive Order 13910, which stated, *inter alia*: "To ensure that our Nation's healthcare systems are able to surge capacity and capability to respond to the spread of COVID-19, it is the policy of the United States that health and medical resources needed to respond to the spread of COVID-19, such as personal protective equipment and sanitizing and disinfecting products, are not hoarded." The President delegated to the HHS Secretary the authority "to prevent hoarding of health and medical resources necessary to respond to the spread of COVID-19 . . . ." Exec. Order No. 13910, 85 Fed. Reg. 17001 (Mar. 23, 2020). On March 25, 2020, the HHS Secretary published a notice designating various materials, including N-95 masks and PPE face masks, as "scarce" materials or materials "the supply of which would be threatened by excessive accumulation." Notice of Designation of Scarce Materials or Threatened Materials Subject to COVID-19 Hoarding Prevention Measures, 85 Fed. Reg. 17592 (U.S. Dept. Health & Human Servs. Mar. 25, 2020).

## II.   The Charge Against Defendant

On May 18, 2020, Defendant was charged with one count of conspiracy to violate the DPA. (Information, Dkt. 8.) The Information alleges, in relevant part:

> In or about and between March 2020 and April 2020, . . . Kent Bulloch . . . together with others, did knowingly and willfully conspire to accumulate, for the purpose of resale at prices in excess of prevailing market prices, materials which have been designated by the President as scarce materials or materials the supply of which would be threatened by such accumulation, to wit: certain personal protective equipment ("PPE"), including KN95 Filtering Facepiece Respirators (the "KN95 Masks") and 3-Ply surgical masks (the "3-Ply Masks") . . . .

(Information at 1.) Specifically, the Government alleges that Defendant and his co-conspirators sought to acquire "the largest quantities that they could" of PPE "to resell them at a profit to buyers who, because the supply chain for PPE was severely disrupted in those early days of the COVID-19 pandemic, were willing to pay far more than the prices charged by established PPE vendors." (Govt. Motion in Limine at 1 (ECF pagination), Dkt. 40.) The Government intends to introduce evidence

3

of Defendant's conversations with potential buyers and investors, including conversations with an undercover FBI agent during which Defendant agreed to "arrange a multi-million-dollar purchase by the Undercover of KN95 masks for resale," and agreed to draft an "escrow agreement" that would "fraudulently assist the Undercover by falsely claiming to potential buyers that the masks were not resold at more than a 10% markup." (Govt. Objection to Proposed Jury Charge ("Govt. Obj.") at 3, Dkt. 48). According to the Government, the undercover agent indicated to Defendant "that he intended to increase the re-sale price of the PPE by 50 percent," and Defendant "agreed to this arrangement and . . . agreed to accept 10 percent of the profits from these sales in exchange for allowing the UC's putative buyers to make payments through a bank account controlled by [Defendant]." (Information at 2.)

In addition, the Government alleges that the recorded conversations will show that Defendant and/or his co-conspirators "engaged in detailed logistical planning and express contemplation of taking physical possession of masks." (Govt. Letter in Opposition to Def. Motion to Dismiss ("Govt. Response") at 3, Dkt. 56 (emphasis in original).) For example, Defendant made statements "about receiving one million masks (which he intended to purchase after receiving millions of dollars from the undercover agent) in California and arranging logistics for their transport to New York." (*Id.*) Defendant stated that he would "probably . . . have to go there and do this in person" despite it being a nine-hour drive (*id.* (quoting GX 102T at 23)), and his co-conspirator William Young, Sr. stated that he could pick up the materials in California without the need for a tractor trailer truck and he "could just haul them over in a box truck." (*Id.* (quoting GX 102T at 16).) Moreover, the Government alleges that in a recorded telephone call, Defendant "urged a potential investor to help him 'get in line' by putting up money to take possession of masks and complained that 'we had two and a half million in a warehouse yesterday, they're sold today.'" (Govt. Obj. at 2-3 (quoting GX 102T).)

The Government quotes Defendant as stating in a recorded telephone call,

4

> what's happening out there is that, I think that people are starting to read the writing on the wall and realizing there's going be a real shortage of masks. They cannot make the number of masks they're going to need, because Americans need to get back working and there's just no way, um, the production level is set up for, for you know, one percent of what we're gonna need. So people are starting to realize that there's a real profit to be made, and they're jumping on it so fast, that for us to get in line, what we need is to be able to say, show proof of funds, and then pay the moment the masks arrive.

(*Id.* at 2 (quoting GX 102T at 6).)

Finally, the Government intends to introduce portions of the recorded phone calls which it claims demonstrate Defendant's consciousness of guilt. (*See* Govt. Response at 3 (quoting GX 102T at 21-22).)

Defendant argues that he "sought to act solely as a broker negotiating transactions in which, once a purchaser placed payment in escrow, a quantity of masks would be obtained from a supplier for immediate distribution to the purchaser." (Motion to Dismiss at 2.) He contends that he and his co-conspirators "did not own or rent a warehouse or other facility for storing masks and their agreement with one another did not contemplate maintaining an inventory of masks." (*Id.*)

On May 26, 2022, the Government submitted a motion that contained its requested jury instructions. ("Govt. Jury Instructions," Dkt. 39). On June 15, 2022, Defendant filed a motion containing his proposed jury instructions ("Def. Jury Instructions," Dkt. 44) supported by a Memorandum of Law. ("Def. Mem. of Law," Dkt. 45-1.) The Government filed its objections on June 29, 2022. (Govt. Obj.) On July 14, 2022, a pre-trial conference was held at which the parties made oral arguments regarding their proposed jury instructions. (*See* Minute Entry dated July 14, 2022.) The next day, the Court emailed the parties a copy of its intended jury instructions.

On July 15, 2022, Defendant filed the Motion to Dismiss the Information. (Motion to Dismiss.) The Government filed its Response on July 16, 2022 (Govt. Response), and Defendant filed his Reply on July 17, 2022. ("Def. Reply," Dkt. 58.) Trial is scheduled to begin on July 20, 2022.

5

**LEGAL STANDARD**

Defendant argues that 50 U.S.C. § 4512 is unconstitutionally vague as applied to him because (1) it criminalizes the "accumulating" of scarce materials without requiring that the conduct involve hoarding, and (2) it permits the application of an arbitrary time period as the reference point for determining "prevailing market price."

The DPA states in relevant part,

> In order to prevent hoarding, no person shall accumulate (1) in excess of the reasonable demands of business, personal, or home consumption, or (2) for the purpose of resale at prices in excess of prevailing market prices, materials which have been designated by the President as scarce materials or materials the supply of which would be threatened by such accumulation. The President shall order published in the Federal Register, and in such other manner as he may deem appropriate, every designation of materials the accumulation of which is unlawful and any withdrawal of such designation.

50 U.S.C. § 4512.

Under the "void-for-vagueness" doctrine, a statute is void only when it is "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015); *see also Rubin v. Garvin*, 544 F.3d 461, 467 (2d Cir. 2008). That "Congress might, without difficulty, have chosen '[c]learer and more precise language' equally capable of achieving the end which it sought does not mean that the statute which it in fact drafted is unconstitutionally vague." *United States v. Powell*, 423 U.S. 87, 94 (1975) (quoting *United States v. Petrillo*, 332 U.S. 1, 7 (1947)). When a vagueness challenge does not raise First Amendment concerns, the Court considers the statute's vagueness as applied to the facts of the case. *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988).

## ANALYSIS

I.  **"Accumulation" Under the DPA**

Defendant argues that Section 4512's prefatory clause, "to prevent hoarding," would lead a person of ordinary intelligence to believe that only conduct that constitutes "hoarding" falls under the statute's purview. (Motion to Dismiss at 2.) He contends that "the word 'accumulate' in the context of 50 U.S.C. § 4512 unambiguously refers to conduct that entails hoarding . . . ." (*Id.* at 3.) Defendant references www.Dictionary.com, which defines "hoard" as "to accumulate for preservation, future use, etc. in a hidden or carefully guarded place: to hoard food during a shortage." (Def. Mem. of Law at 6.) Therefore, he contends that "hoarding" requires "withholding . . . from the market for a meaningful period of time." (*Id.* at 2.)

Defendant maintains that because the Court's intended jury instruction defines "accumulate" simply as "to gather, collect, or accrue," without reference to "hoarding" and without imposing any temporal requirement, the statute is unconstitutionally vague in that it fails to "give notice that the conduct at issue in the present case falls within [the statute's] prohibition." (Motion to Dismiss at 2.) Defendant "contend[s] that the statute as applied violates [his] right to due process because he could not reasonably be expected to understand that it applies to the conduct in which he agreed to engage – conduct that did not involve any form of hoarding." (*Id.* at 2.)

Defendant's argument regarding the meaning of "accumulate" under the DPA is novel. However, the principles of statutory interpretation are well-established. When interpreting a statute, the Court looks first to the statute's plain meaning. *United States v. Dauray*, 215 F.3d 257, 260 (2d Cir. 2000). "The meaning of a particular section in a statute can be understood in context with and by reference to the whole statutory scheme, by appreciating how sections relate to one another. In other words, the preferred meaning of a statutory provision is one that is consonant with the rest of the statute." *Auburn Hous. Auth. v. Martinez*, 277 F.3d 138, 144 (2d Cir. 2002). When the plain language

7

is ambiguous, the Court should examine the statute's legislative history. *Id.* at 143-44 (quoting *Dauray*, 215 F.3d at 264).

The plain language of 50 U.S.C. § 4512 is unambiguous and contains no temporal element. Section 4512 prohibits the accumulation of materials that have been designated by the President as "scarce" or "materials the supply of which would be threatened by such accumulation." 50 U.S.C. § 4512. The statute's language demonstrates that it is concerned with preventing scarcity and ensuring an available supply of needed materials, especially during a national emergency. *See* CRS Report at 5.

Defendant is correct that the prefatory phrase, "In order to prevent hoarding," applies to the entire provision, not just to the first subsection, which proscribes the accumulation of scarce or threatened materials "in excess of the reasonable demands of business, personal, or home consumption." Subsection (1) addresses the goal of preventing and ameliorating scarcity by making it a crime to gather, collect, or accrue more than one can reasonably use. If a person or business accumulates a large quantity of scarce items beyond what can be consumed, those items are necessarily unavailable to others who need them.

The second subsection of the statute also aims to prevent hoarding, but it does so by prohibiting the accumulation of materials that are scarce or whose supply "would be threatened by such accumulation," if it is "for the purpose of resale at prices in excess of prevailing market prices." Thus, in order to constitute a violation of subsection (2), the accumulation of materials need not be in a quantity that exceeds what can be consumed, but it must be for a particular prohibited purpose, that is, for "resale at prices in excess of prevailing market prices."

Defendant is again correct that the act which is criminalized by Section 4512 consists not of selling, but of accumulating, the scarce or threatened materials. (*See* Def. Mem. of Law at 9.) Thus, a person need not actually sell any materials above prevailing market prices—or sell them at all—in

8

order to violate this provision. The statute simply proscribes accumulating *for the purpose of* selling above prevailing market prices. It is the intention that matters, not any further act.

However, the Court rejects Defendant's contention that the form of accumulation prohibited by subsection (2) must itself fall under his definition of "hoarding" in order to survive a vagueness challenge. Even if this form of accumulation does not itself constitute a form of hoarding, its regulation falls comfortably within Section 4512's stated goal of *preventing* hoarding. The accumulation of scarce materials in order to resell them at prices "in excess of prevailing market prices" can lead to hoarding, even under Defendant's definition, in the form of panic buying by consumers who fear that prices will increase further, and by speculators motivated by greed who will buy and either hold onto scarce materials in the hopes that prices will rise further or attempt to sell them at inflated prices. These outcomes create or contribute to scarcity, the harm which the DPA seeks to address.

Thus, Defendant is incorrect that conduct under 50 U.S.C. § 4512 must itself amount to hoarding in order "to give ordinary people fair notice of the conduct it punishes." *Johnson*, 576 U.S. at 596. The prohibited conduct serves the statute's goal of preventing hoarding, even if the conduct it criminalizes does not necessarily constitute hoarding in the sense that Defendant defines it, *i.e.*, as requiring retention of the accumulated materials for some period of time.[1]

Furthermore, Section 4512 contains no requirement that a defendant hold onto the scarce materials for any period of time—let alone a "meaningful" one—once he has accumulated them. The plain wording of the statute does not specify any act beyond accumulating, such as maintaining an inventory (*see* Motion to Dismiss at 2; Def. Mem. of Law at 2), and the purpose of the accumulation can exist simultaneously with the act. Carrying out the purpose can even precede the act, as Defendant

---

[1] An argument could be made that accumulation under this provision does constitute hoarding and contributes to scarcity, since a person who accrues, collects, or gathers scarce materials for the purpose of selling them above prevailing market prices removes those items from the market, however temporarily, thus making them unavailable to established sellers who could—and presumably, would—otherwise sell them at the prevailing market prices.

9

has stated that he "intended to acquire KN95 and 3-Ply masks only after lining up a purchaser who would take immediate delivery." (Mem. of Law at 2.) Defendant described his role as one of a "broker negotiating transactions in which, once a purchaser placed payment in escrow, a quantity of masks would be obtained from a supplier for immediate distribution to the purchaser."[2] (Motion to Dismiss at 2.) In that role, he contends that "far from seeking to hoard scarce materials, [he] sought to distribute them into the market as quickly as possible." (Mem. of Law at 3.) The immediacy of his resales, however, does not negate his purpose in accumulating the materials in the first place.[3]

Thus, 50 U.S.C. § 4512 is not void for vagueness on the basis that it governs conduct that does not itself constitute hoarding, or on the basis that it lacks a requirement that accumulated scarce materials be retained for some amount of time.

The Court further notes that the DPA contains a scienter element, requiring that a defendant act "willfully" in order to be convicted under its provisions. 50 U.S.C. § 4513. "A scienter requirement may mitigate a law's vagueness, especially where the defendant alleges inadequate notice." *Rubin*, 544 F.3d at 467. The inclusion of such a willfulness requirement "alleviate[s] vagueness concerns." *United States v. Ritchey*, No. 21-CR-6 (HSO)(RPM), 2022 WL 1645801, at *11 (S.D. Miss. May 24, 2022) (alteration in original) (citations omitted) (finding DPA's willfulness requirement "further mitigates [defendant's] concern regarding the definiteness with which prevailing market price is defined"); *United States v. Leal-Matos*, No. 21-150 (SCC), 2022 WL 476094, at * 1 (D. P.R. Feb. 15, 2022) ("Scienter

---

[2] Since Defendant is charged with conspiracy, the Government also need not prove that Defendant personally possessed the scarce materials at any point. (Govt. Response at 3); *see* 18 U.S.C. § 371 ("If two or more persons conspire . . . to commit any offense against the United States . . . and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.").

[3] It is worth noting that the DPA addresses scarcity during national emergencies when time is frequently of the essence. The urgency of such a situation would make a requirement that one keep scarce materials for a lengthy period of time before resale meaningless.

requirements, like [the DPA's], lessen fair notice concerns and diminish the likelihood of unfair enforcement.").

## II. "Prevailing Market Prices" Under the DPA

Defendant argues that the term "prevailing market price" is unconstitutionally vague and "leaves it to the government, or perhaps the Court, to select a standard that is not specified in the statute and leaves the jury free to adopt an arbitrary time period as the basis for determining that the defendant's conduct violated the statute." (Motion to Dismiss at 4.) Defendant seeks to cure this vagueness by defining "prevailing market price" as the price that existed at the beginning of the accumulation. (*Id.* at 3.) There is no need or legal basis for imposing such a requirement.

The Court finds persuasive the reasoning by courts in three recent cases which have rejected void-for-vagueness challenges to the DPA's phrase "prevailing market price" that are nearly identical to that of Defendant's. *See Ritchey*, 2022 WL 1645801; *Leal-Matos*, 2022 WL 476094; *United States v. Topouzian*, No. 20-CR-721, 2021 WL 5882204, at *2 (N.D. Ill. Dec. 13, 2021). In *Topouzian*, the court noted that the DPA has been in existence since 1950, and "the passage of time—here, 70 years—simply reinforces [the] presumption [of validity]." 2021 WL 5882204, at *4. It also found that the phrase "prevailing market price" enjoys "more than a century of unbroken usage . . . in every imaginable legal context." *Id.* at *5 (noting that, "[a] Westlaw search of the phrase, 'prevailing market price,' reveals that it has been used in 1,107 federal cases going back to 1894 . . . [and] has been used in 14 Supreme Court cases going back to 1926."). Thus, "the phrase 'prevailing market price' has been in general usage in the law in this country for more than a century." *Id.* at *8. "The standard set by the statute, 'prevailing market price,' is clear; its necessary ascertainment in any given case is the antithesis of vagueness." *Id.* Similarly, in *Leal-Matos*, the court found that "'prevailing market prices' is a familiar phrase that provides a sufficiently definite, ascertainable standard." 2022 WL 476094, at *2.

Moreover, just because the statute does not fix a specific price or time period for determining the "prevailing market price" does not make the statute vague. For example, the "prevailing market price" in one state might differ from that in another. *Topouzian*, 2021 WL 5882204, at *6. Thus, "[a]ny suggestion that the [DPA] must specify a specific numerical price applicable everywhere at a given time to avoid the vagueness doctrine is unpersuasive and contrary to economic reality." *Id.* The court in *Topouzian* further found that Congress intended for the term's meaning to be consistent with "what it had meant throughout its long and continuous usage in this Country: *i.e.* those prices charged by established vendors in the relevant market, not new market entrants seeking to inflate prices above those routinely charged in the relevant market." *Id.* at *8 (citing DPA Hearing).

Because the term "prevailing market prices" in the DPA provides an ascertainable standard—even if it is not set forth in the statute, may vary depending on location and time, and must be ascertained in the course of trial—it is not "so standardless that it invites arbitrary enforcement." *Johnson*, 576 U.S. at 595.

Finally, Defendant's vagueness challenge to this portion of the statute fails because the conduct of which he is accused is "within the core of conduct that the DPA prohibits." *See Leal-Matos*, 2022 WL 476094, at *2. Government alleges that Defendant conspired with others to accumulate millions of masks to resell at a markup in excess of 10% (Govt. Obj. at 2-3), that he sent an undercover agent an "escrow agreement" to assist the agent in "falsely claiming to potential buyers that the masks were not resold at more than a 10% markup" (*id.* at 3), and that he agreed with the agent's proposal to "increase the re-sale price of the PPE by 50 percent." (Information at 2.)

Accordingly, the Court finds that 50 U.S. Code § 4512 is not void for vagueness based on the term "prevailing market prices."

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss is denied.

**SO ORDERED:**

*Peggy Kuo*

PEGGY KUO

United States Magistrate Judge

Dated: Brooklyn, New York

July 19, 2022

13